**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

_____

| | | |
|---|---|---|
| SUSAN GOMEZ, Individually | ) | Case No. |
| And On Behalf of All Others Similarly | ) | |
| Situated | ) | |
| 150 West Main Street, #285 | ) | Judge |
| Waukesha, WI  53186 | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT WITH JURY DEMAND** |
| | ) | |
| v. | ) | |
| | ) | |
| HICKORY SPRINGS | ) | |
| MANUFACTURING | ) | |
| 235 2nd Avenue, NW, | ) | |
| Hickory, NC  28601 | ) | |
| | ) | |
| VALLE FOAM INDUSTRIES, INC. | ) | |
| 4 West Dr. | ) | |
| Brampton, Ontario  L6T 2H7 | ) | |
| Canada | ) | |
| | ) | |
| DOMFOAM INTERNATIONAL, INC. | ) | |
| 8785 Langelier Blvd. | ) | |
| Montreal, Quebec   H1P 2C | ) | |
| Canada | ) | |
| | ) | |
| THE CARPENTER COMPANY | ) | |
| 5016 Monument Avenue | ) | |
| Richmond, Virginia  23230 | ) | |
| | ) | |
| THE WOODBRDGE GROUP | ) | |
| 4240 Sherwoodtowne Blvd. | ) | |
| Mississauga, Ontario, L4Z 2G6 | ) | |
| Canada | ) | |
| | ) | |
| FLEXIBLE FOAM PRODUCTS, INC. | ) | |
| 12575 Bailey Road, | ) | |
| Spencerville, Ohio, 45887 | ) | |
| | ) | |
| SCOTTDEL, INC. | ) | |
| 400 Church Street | ) | |
| Swanton, Ohio 43558 | ) | |
| | ) | |
| FOAMEX INNOVATIONS, INC. | ) | |

1

Rose Tree Corporate Center II      )
1400 N. Providence Road, Suite 2000   )
Media, PA 19063-2076        )
                                  )
FUTURE FOAM, INC.        )
1610 Avenue N,          )
Council Bluffs, Iowa 51501     )
                                  )
VITAFOAM PRODUCTS CANADA  )
150 Toro Road,          )
North York, Ontario M3J 2A9    )
Canada                )
                                  )
VITAFOAM INC.         )
2215 Shore Drive,       )
High Point, North Carolina 27263   )
                                  )
                 Defendants.   )
                                  )
                                  )

_____

      Plaintiff Susan Gomez ("Gomez" or "Plaintiff"), individually and on behalf of a class of all those similarly situated, brings this action to recover damages and to obtain injunctive relief for violation of antitrust, consumer protection and unjust enrichment laws against defendants Hickory Springs Manufacturing Company, Valle Foam Industries, Inc., Domfoam International, Inc., The Carpenter Company, The Woodbridge Group, Flexible Foam Products, Inc., Scottdel Inc., Foamex Innovations, Inc., Future Foam, Inc., Vitafoam Products Canada Limited, and Vitafoam Inc. ("Defendants"), which are or were operating in the market known as polyurethane foam in the United States between at least 1999 and the present. Plaintiff Gomez demands a trial by jury and alleges the following on information and belief:

## <u>NATURE OF THE ACTION</u>

      1.     This case arises out of a conspiracy among Defendants and their co-conspirators with the purpose and effect of fixing prices of polyurethane foam and polyurethane foam products ("polyurethane foam"). During the Class Period, and earlier, Defendants contracted,

combined or conspired to fix, raise, maintain and/or stabilize prices and allocate customers for polyurethane foam in the United States, the purpose and effect of which is to maintain supracompetitive prices, by the means and mechanisms described herein.  As set forth below, the conspiracy is reflected in specific and detailed communications between and among executives and employees of Defendants and their co-conspirators who have communicated with one another to fix prices and allocate customers.

2.      This case is brought as a class action on behalf of all persons who purchased polyurethane foam indirectly from Defendants or their co-conspirators from at least as early as 1999 to the present (hereinafter, the "Class Period").

3.      As alleged herein, Defendants explicitly agreed with each other to charge inflated prices for polyurethane foam. Every price increase known during the Class Period was the result of conspiratorial and anti-competitive discussions among Defendants to fix prices. Defendants also engaged in a combination and conspiracy among themselves to allocate customers in specific communications between each other.

4.      As a direct and proximate result of the unlawful conduct and price-fixing conspiracy of Defendants and their co-conspirators, as alleged in this Complaint, Plaintiff and the other members of the Class (defined below) have paid more during the Class Period for polyurethane foam than they otherwise would have paid in a competitive market and therefore, have been injured.

5.      Plaintiff has been an indirect purchaser of polyurethane foam from one or more of the Defendants during the Class Period.  Plaintiff brings this class action to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees, and for such other relief as is afforded under the antitrust, consumer protection, and unjust enrichment laws of the relevant jurisdictions in the United States.

6.      Plaintiff also brings this lawsuit as a class action pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, to enjoin Defendants' anticompetitive conduct and for costs of suit, including reasonable attorneys' fees, and for such other relief as is afforded under the antitrust laws of the United States.

## PLAINTIFF

7.      Plaintiff Susan Gomez is a Wisconsin resident.  During the Class Period, Susan Gomez purchased a polyurethane foam mattress and a polyurethane foam mattress pad indirectly from one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.

8.      The prices Susan Gomez paid for polyurethane foam were greater than the prices she would have paid in the absence of Defendants' unlawful conduct alleged herein. Susan Gomez has therefore been injured by reason of Defendants' antitrust violations.  Gomez brings this lawsuit as a class action on behalf of herself and all indirect purchasers who, during the Class Period, purchased from vendors selling polyurethane foam manufactured and/or distributed by one or more of the Defendants which resulted in injury.

## DEFENDANTS

9.      Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its headquarters located at 235 2nd Avenue, NW, Hickory, North Carolina, 28601.  During the Class Period, Hickory Springs indirectly sold polyurethane foam throughout the United States.

10.     Hickory Springs Manufacturing Company is "one of the nation's largest integrated components manufacturers and suppliers for the furniture and bedding industries with more than 60 operating facilities in the United States and throughout the world. The furniture industry is the largest segment of Hickory Springs' customer base. With more than 160 flexible

polyurethane foam formulations, Hickory Springs is one of the United States' largest producers of foam."

11.     Defendant Valle Foam Industries, Inc. ("Valle") is a privately owned and operated corporation with its headquarters located at 4 West Dr., Brampton, Ontario, L6T 2H7, Canada.  During the Class Period, Valle, indirectly and/or through its control of its affiliates, sold polyurethane foam throughout the United States.

12.     Valle manufactures slab stock polyurethane foams for the furniture, bedding, packaging, carpet and children's toy industries.

13.     Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its headquarters located at 8785 Langelier Blvd., Montreal, Quebec, H1P 2C, Canada. During the Class Period Domfoam sold polyurethane foam throughout the United States.

14.     Domfoam is a manufacturer/wholesaler of sponge & polyurethane foam.  Since its incorporation in 1963, Domfoam has grown to be Canada's leading and most diversified manufacturer of ether, ester, rebounded flexible polyurethane foams and visco elastic foam. According to its website, "[i]n its 260,000 square-foot Montreal plant, Domfoam services the demanding urethane market in Canada and in the USA by meeting the toughest industry standards and requirements."  Domfoam provides foam for the following purposes:  mattresses, sponge foam blocks, carpet cushion, pillows, bolsters, convolute, furniture foam, toppers, antistatic foam, antimicrobial foam, visco-elastic foam, camping foam, and sporting goods."

15.     Defendant The Carpenter Company ("Carpenter") is a privately owned and operated company with its headquarters located at 5016 Monument Avenue, Richmond, Virginia, 23230.  Carpenter operates from around 30 locations in the United States, locations in Canada and around 20 locations in Europe.  During the Class Period, Carpenter sold

5

polyurethane foam throughout the United States.

16.     Carpenter Co. is the largest manufacturer of polyurethane foam cushioning in the world.  It has divisions on the following areas: air filter media, bedding, carpet cushion, chemicals, chemical systems, consumer products, expanded polystyrene systems, flexible foam packaging furniture, molded manufacturing, polyester fiber, and tire products.

17.     Defendant The Woodbridge Group ("Woodbridge") is a Canadian corporation with its headquarters located at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6, Canada.  During the Class Period, Woodbridge sold polyurethane foam throughout the United States.

18.     Woodbridge supplies foam for automotive components, but also supplies a diverse sectors including: commercial and recreational transportation, building products, construction, packaging and several consumer and industrial markets.

19.     Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located at 12575 Bailey Road, Spencerville, Ohio, 45887 and operations in Texas, Indiana, Florida and Wisconsin. It is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio.  During the Class Period, Flexible Foam sold polyurethane foam throughout the United States.

20.     Flexible Foam manufactures polyurethane foam and rebond products serving customers in the bedding, flooring, furniture, packaging, and automotive industries.

21.     Defendant Scottdel Inc. ("Scottdel") is a privately held corporation with its headquarters located at 400 Church Street, Swanton, Ohio 43558. During the Class Period, Scottdel sold polyurethane foam throughout the United States.

22.     Scottdel began manufacturing bonded urethane carpet cushion in 1961 and the company manufactures a complete line of commercial and residential bonded urethane cushions

ranging in density from 3.5 pounds to 10 pounds per cubic foot."

23.     Defendant Foamex Innovations, Inc., formerly known as Foamex International, Inc. ("Foamex"), is a privately owned and operated company with its headquarters located at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania 19063-2076.  During the Class Period, Foamex sold polyurethane foam throughout the United States.

24.     Foamex is a leading producer for the home, healthcare, electronics, industrial, personal care and transportation markets.  Its products include finished goods, sub-assemblies, services and raw materials for OEMs, fabricators and retailers.  Its foam is used by the automotive, shipping, furniture, and electronics industries as well as critical components for filters, dispensers, gaskets and seals in a variety of products.

25.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located at 1610 Avenue N, Council Bluffs, Iowa 51501. During the Class Period, Foamex sold polyurethane foam throughout the United States.

26.     Future Foam produces foam products and services for bedding, foam blocks, carpet cushion, furniture, and packaging.

27.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York, Ontario M3J 2A9, Canada. During the Class Period, Vitafoam sold polyurethane foam, either directly or through its affiliates, throughout the United States.

28.     Vitafoam Canada manufactures all types of flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory foams.  It also produces latex mattresses and toppers.

29.     Vitafoam Inc. ("Vitafoam Inc.") is a privately owned and operated company with

its headquarters located a 2215 Shore Drive, High Point, North Carolina 27263. During the

Class Period, Vitafoam Inc. sold polyurethane foam, either directly or through its affiliates,

throughout the United States, and also sold foam to vendors for distribution to customers like

Plaintiff.  Collectively, Vitafoam Canada and Vitafoam Inc. are referred to as Vitafoam.

     30.     Vitafoam, Inc. manufactures plastic netting, automotive products, general

trade, and nonwoven products. It produces mattresses and pads, convoluted pads, wheelchair

components, and protective packaging for medical supplies, as well as positioning and support

wedges, and immobilizing devices, such as neck bracing pillows for the home and commercial

healthcare industries. The company offers polyurethane foam products for packaging, furniture,

and upholstery industries; marine industry products, such as fenders, drainable boat seats,

waterproof cushions, air circulation pads, and filtration devices; and foam for fabric producers,

laminators, trim companies, and original equipment manufacturers in the automotive industry. It

also provides laminating materials, such as fabrics, flexible polyurethane foam, nonwoven

webs, films, and other substrates, as well as carpet underlay for residential and commercial

sectors. Vitafoam, Inc. also serves medical, marine, technical, bedding, lamination, and carpet

underlay industries.

### AGENTS AND CO-CONSPIRATORS

     31.     The acts alleged against the Defendants in this Complaint were authorized,

ordered, or done by their officers, agents, employees, or representatives, while actively engaged

in the management and operation of Defendants' businesses or affairs.

     32.     Various persons, corporations, and entities not named as defendants herein

may have participated as co-conspirators in the violations alleged herein and may have performed

acts and made statements in furtherance thereof.

33.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## JURISDICTION AND VENUE

34.     Plaintiff brings this action to obtain injunctive relief arising from Defendants' violations of Section 16 of the Clayton Act, 15 U.S.C. §26 and Section 1 of the Sherman Act, 15 U.S.C. §1, to recover the costs of suit, including reasonable attorneys' fees, and to seek such other relief as is afforded under the antitrust laws of the United States.  Jurisdiction is conferred upon this District pursuant to 15 U.S.C. §26, and 28 U.S.C. §§1331, 1337 and 1367.

35.     Venue is proper in this District pursuant to 28 U.S.C. §§15, 22 and 26 and pursuant to 28 U.S.C. §1391(b), (c) and (d), because at all times relevant to the Complaint, Defendants transacted business, were found, or acted through subsidiaries or agents present in this District. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.  The acts complaint of have had, and will have, substantial anti-competitive effects within this District.

36.     Plaintiff Susan Gomez is a resident of Waukesha, Wisconsin who purchased polyurethane foam indirectly from Defendants.

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337 and 15 U.S.C. §15.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.  Venue is proper in this district pursuant to 28 U.S.C. §15 and pursuant to 28 U.S.C. §1391(b), (c) and (d), because at all times relevant to the Complaint, (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of Plaintiff's claims occurred in this district; (c) a

substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

38.    This Court has personal jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this district and/or participated in the unlawful conspiracy through persons and entities located in this district, including the fixing prices of polyurethane foam sold to purchasers in this district, including distributing foam to vendors for sale within this district; (b) transacted business in polyurethane foam and other products in this district; (c) maintains and have maintained continuous and systemic contacts with this district over a period of years; (d) purposefully availed itself of the benefits of doing business in this district. Accordingly, each of the Defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

## FACTUAL ALLEGATIONS
### The Polyurethane Foam Market

39.    Polyurethane foams are used to insulate objects or reduce shock. Specifically, polyurethane foams are used in bedding, packaging, seat cushioning, carpet cushioning, shipping pads and shipping cushioning, car interiors, fluid filtration systems, anti-noise and vibration systems in aircraft, medical devices, and in a number of consumer applications.

40.    Polyurethane foam refers to different types of foam consisting of polymers made of molecular chains bound together by urethane links. It can be flexible or rigid, but generally has a low density.

41.    Flexible polyurethane foam is most often used in bedding and upholstery, while the more rigid variety is used for products, thermal insulation and in automobile dashboards.  Micocellular foam may be used to make car steering wheels or lines the insides

10

of athletic helmets. Elastomeric foam is typically used to make the outer sole of many types of footwear, including athletic shoes.

42.     The four classes of polyurethane foam, all with different physical properties, are created by varying a basic addition polymerization reaction involving a diol or polyol, a diioscyanate, and water.

43.     The diisocyanate reacts with the diol or polyol to create the urethane polymer. Water reacts with some of the isocyanate groups to produce carbon dioxide gas, and the bubbles get trapped in the viscous liquid as it polymerizes, expands, and solidifies.  Catalysts and surfactants can be added to boost the reactions and control the foaming process.  A wide range of other additives, including stabilizers, dyes, fire retardants, and fungicides, may be added to meet specific performance demands.  Auxiliary blowing agents, such as hydrofluorcarbons, liquid carbon dioxide, and acetone, are also typically used to prepare the foam.  Ultimately, the kinds and amounts of raw materials used in the manufacturing process help determine how the final product performs.

44.     To manufacture foam for cushioning, two basic procedures are used.  In one, the chemical mix is poured onto a moving conveyor, where it is allowed to react and expand.  Sides on the conveyor allow the foam to rise into a "bun" or slab anywhere from two to four feet high. The continuous slap is then cut, stored, and allowed to cure for up to 24 hours.  This manufacturing procedure is the "slabstock" production process.  The cured foam is subsequently fabricated into useful shapes.  Most foams for use in furniture and bedding are produced this way.

45.      A second method, foam molding, is a process where individual items are produced by pouring foam chemicals into specially shaped molds and allowing the foam reaction to take place. This process is used primarily for automotive cushioning (such as seats,

11

armrests, and headrests), although some contract furniture utilizes molded cushions.  This foam is sometimes is referred to as "semi-flexible."

46.    Flexible foams have mainly open cells, formed by gas bubbles that have popped. Air can pass through the foam easily, resulting in a soft, resilient, flexible material. In rigid foams, most of the cells stay closed. The material is thus harder and less resilient. Controlling the proportion of open cells to closed cells during the production process is one of the ways that the properties of foam can be manipulated, adding to the material's versatility.

47.    Flexible polyurethane foam ("FPF") is widely used for its qualities: it is light weight, resilient, quiet, low odor and resistant to mildew and other triggers of common allergies. FPF may also be molded and cut.  More than 1.2 billion pounds of foam are produced and used every year in the U.S.

48.    Rigid polyurethane foam is commonly used in construction. It has unique insulating properties that make it ideal for walls and roofs because of its remarkably strong, yet lightweight, low-density structure that is both dimensionally stable and moisture-resistant with low vapor transmission.  It is commonly used for insulation, and when sprayed, it provides weatherproof sealants, forms a seamless layer of insulation, and fills gaps and seams during application and covers irregular, hard-to-insulate shapes.

49.    There are few acceptable alternatives for polyurethane foam.  In furniture and bedding applications, short staple polyester fiber or cotton may be used, but both alternative materials have poor height recovery characteristics after compression.  Steel springs also recover well, but must be insulated from the user with some type of cushioning material. According to the Polyurethane Foam Association, "comparing [polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute for polyurethane foam."

50. In 2010, domestic revenue for polyurethane foam industry is expected to be approximately $12 billion. Furniture and furnishings account for 36.7% of industry revenue. The major products in this segment include pillows, seating, cushioning, mattress cores and quilt rolls. Transportation products account for 19.1% of the industry revenue. This segment includes foam used for automotive seating, protective cushioning and sound insulation in cars and light trucks. Building and construction account for 12% of industry revenue. Packaging products account for 5.3% of industry revenue. Major packaging products include protective shipping pads and food containers.

51. There has been a recent trend towards consolidation within the industry.  Major players within the industry have been active in acquiring smaller companies and other competitors over the course of the last ten years.  For example, in 2007, Defendant Carpenter acquired its European competitor, Dumo NV, Carpenter owns approximately 16.3% of the market share in this industry.

52. After its parent corporation was acquired in 2006, Vitafoam, Inc. sold one plant to Olympics Product, LLC, a joint venture between Woodridge and Hickory Springs.  It sold another plant to Flexible Foam Products.

53. Defendants alleged here to be participants in the conspiracy are most of the major North American polyurethane foam producers, representing a significant portion of the United States market.  There are virtually no imports of products in this industry due to the prohibitive freight costs involved in transporting these bulky, low unit priced products over long distances.

## DEFENDANT VITAFOAM'S ADMISSION OF A CONSPIRACY

54. According to public documents, in February 2010, Vitafoam voluntarily approached the U.S. Department of Justice's ("DOJ"), Antitrust Division, to self-report

13

evidence of illegal antitrust activities amongst itself and other companies and individuals in the industry ("competitors") and to seek acceptance into the Antitrust Division's Corporate Leniency Program.  Since that time, Vitafoam and its employees have been cooperating with the investigation.

55.     As a result of its application, Vitafoam has received a conditional leniency letter from the DOJ's Antitrust Division.  This fact, in and of itself, is significant.  It means that Vitafoam has admitted to participation in a conspiracy to violate the antitrust laws.  The significance of obtaining a conditional leniency letter was explained by Scott D. Hammond, Deputy Assistant Attorney General for Criminal Enforcement, in a November 19, 2008 presentation available on the DOJ's website at:

http://www.usdoj.gov/atr/public/criminal/239583.pdf).

## THE CONSPIRACY TO FIX PRICES AND ALLOCATE CUSTOMERS

56.     A former President of Vitafoam, who worked for Vitafoam from the 1960s until October 2008, along with other individuals at Vitafoam, directly participated in the long-running price fixing and customer allocation conspiracy alleged herein relating to polyurethane foam in North America.

57.     Another Vitafoam employee, a former vice president of Sales and Marketing for Vitafoam, worked in the polyurethane foam industry since 1963.  He first worked for Woodbridge, and then in 1973 joined Vitafoam's predecessor, Pre-Fab Cushioning Products.  This former vice president worked for Vitafoam in Canada until March 2009 when he retired.  He, along with other individuals at Vitafoam, as well as other companies, had been involved in a long-running price fixing and customer allocation conspiracy that included North America and the United States.

58.     The impetus for the conspiratorial conduct was typically increases in raw material costs. Defendants (or "foamers" as they are referred to at times in the industry) utilize chemicals, including polyols and toluene diisocycanate (or "TDI") in the manufacturing of polyurethane foam.

59.     When defendants' raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, the foamers contacted each other. During the communications, the defendants discussed supporting specific price increases and the timing of announcements regarding an effective date of such increases. The former president Vitafoam has knowledge that this type of concerted activity has gone on for at least 20 to 25 years.

60.     During this period, there was an understanding and agreement among the competitors in the foam industry to collectively support price increases. This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases with typically the same effective dates. Price increase announcement letters were then mailed to customers, reflecting the prices determined by the conspirators.

61.     The former president of Vitafoam, along with his subordinates, had conspiratorial discussions with competitors concerning this conspiracy to fix prices and to allocate customers. These discussions included Tony Dacosta, Al Zinn, and Doug Dauphin of defendant Foamex; Max Tenpow of defendant Carpenter; Bruce Schneider of defendant Future Foam; Don Coleman of defendant Hickory; and Robert Valle and Dean Bryiannis of defendant Valle Foam.

62.     Vitafoam had a policy of not having conversations with competitors, but this policy was merely window-dressing and was not followed in practice.

63.     As part of the conduct to coordinate or support price increases, the former Vitafoam president instructed his sales people to send copies of their draft price increase letters to competitors.

64.     In addition to discussions he had with competitors, the salespeople of Vitafoam also had discussions with the other defendants concerning price increases and the timing of those increases.  These discussions involved inquiries as to whether each competitor was going to support the price increase, when the price increases were going to be issued and what the effective dates would be of the increases.  Vitafoam personnel who participate in these discussions included Steve Prescott, Gerry Hannah, David Gurley, Frank Roncandin, George Newton, and Phil Fonseca.

65.     The former vice president and others at Vitafoam also participated in conspiratorial conduct with many individuals employed by numerous companies including:  Valle, Carpenter, Woodbridge, Flexible Foam, Hickory Spring, Dalton Foam, Scottdel, and Foamex.  Individuals at the various competitors included: Stanley Pauley, Ed Malacheck, Mark Kane and Max Tenpow of Carpenter; Tony Vallecoccia, Dean Bryiannis and Robert Val of Valle Foam; Doug Dauphin and Tony Dacosta at Foamex; and John Howard of Domfoam.  Others at Vitafoam who engaged in this conduct included Steve Prescott, David Gurley, George Newton, and Time Prescott.

66.     The former vice president of Vitafoam had communications in furtherance of the conspiracy with Mark Kane of the Defendant Carpenter Group.  He and Kane had discussions on multiple occaisions involving price increases concerning share customer.  In an effort to coordinate their price increases and to make sure those increases went through for the mutual customer, the former vice president and Kane called each other and sent by fax copies of draft price increase letters.

67.     Robert Valle and Tony Vallecoccia of Valle Foam also communicated with other defendants - their competitors - by telephone and also faxed each other copies of their draft price increase letters that would be sent to customers so as to coordinate and collude on price increase percentages and their effect dates.

16

68.     Vitafoam employee David Gurley was a manager involved in scrap foam, which was obtained for use in carpet underlay production. Gurley also had numerous contacts with U.S. polyurethane competitors. As a result of his contacts with competitors, Gurley provided the former Vitafoam executives, as well as Steve Prescott with draft price increase letters and information.

69.     During the class period, Vitafoam employee George Newton contacted Carpenter employee Max Tenpow regarding price increases and the effective dates.

70.     During these price increase time periods, defendants also agreed to avoid each other's customers and not attempt to take business or market share from one another.

71.     A former Woodbridge employee who was employed in Ontario, Canada, from 1986 until 2009 participated in the conspiracy. While working at Defendant Woodbridge, this employee served most recently as vice president of Commercial Sales where he had authority to determine prices. This former Woodbridge employee is currently employed at Vitafoam as its Vice President of Sales, a position he has held since April 2009. In his current position he has authority to determine prices. This current Vitafoam vice president has, along with other individuals employed by defendants, been engaged in a long-running price fixing and customer allocation conspiracy.

72.     This current Vitafoam vice president has engaged in the conspiratorial activity by reaching understandings and agreements on price increases with most of Vitafoam's competitors or the same percentage on the same effective date. He has had personal involvement in this conduct since the early 1990's when he became involved in pricing at Woodbridge, and continued when he joined Vitafoam. This activity involved the U. S. and Canadian markets. The objective of the price increase scheme was for the conspirators to collectively pass raw

material cost increases on to their customers, as well as to maintain their respective market shares.

73.     The participants in this conduct with the current Vitafoam vice president included Woodbridge, Vitafoam, Foamex, Carpenter, Vitafoam U.S., Future Foam, Hickory Springs, Scottdel, Valle and Flexible Foam. The Vitafoam vice president coordinated price increases among competitors, as did co-workers of his at Woodbridge and Vitafoam. The individuals involved in the conspiracy included Bill Lucas and Rik Hennink of Vitafoam U.S.; Peter Farah, Mel Himel, Bob Zorak, David Gurley and Ted Giroux of Vitafoam; Tony Vallecoccia of Valle; Donald Phillips and Vincent Bonaddio for Foamex; Bob Magee, Martin Mazza, and Gus Pasquarelli of Woodbridge; Buster Mann, Todd Councilman and Don Coleman of Hickory Springs; Michael Crowell of Flexible Foam; and Louis Carson of Scottdel.

74.     The current Vitafoam vice president's discussions relating to coordinating price increases among competitors were conducted primarily by means of telephone, electronic mail, and in-person meetings. In person discussions frequently took place at meetings of the Polyurethane Foam Association ("PFA") trade group.

75.     The current Vitafoam vice president and other participants in this conspiracy took numerous steps to avoid detection of their conspiracy. At times, full names would not be used in correspondence and instead participants would only using first names or initials. Conspirators took advantage of attending the PFA meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings.  Similarly, competitors visited each other's manufacturing facilities for the purported purpose of sharing technological and operational advances, but were actually using the opportunity to discuss coordinated price increases.  Another method to avoid detection involved going to a local

Staples or other office store to use the public facsimile machines to send each other price increase letters without the identifying facsimile transmission banner.

76.     On May 26, 2010, Vice President of Sales for Vitafoam attended a PFA meeting in Baltimore, MD.  While there, he discussed foam pricing with competitor Michael Crowell of Flexible Foam.  This conversation involved him being asked by Crowell why Vitafoam was not raising prices or following the increase.

77.     The former Director of Corporate Engineering at Woodbridge is now the President of Vitafoam. He worked at Woodbridge from 1985 until January 2008.  As the Director of Corporate Engineering he had authority to determine prices at Woodbridge.  As the President of Vitafoam, a position he has held since August 2008, he now has authority to determine prices at Vitafoam. He, along with other individuals of Defendant companies, also participated in the long-running price fixing and customer allocation conspiracy.

78.     Discussions with competitors in the foam industry involving the current President of Vitafoam while he was at Woodbridge, included conversations about legitimate topics like business development or potential joint ventures, and then ultimately led to conspiratorial conversations about price increases. These discussions about coordinating pricing took place during in-person discussions, electronic mail communications, and telephone conversations.

79.     This individual participated in conspiratorial discussions concerning pricing in the foam industry while at Woodbridge and Vitafoam with various competitors, including: Bill Lucas of Vitafoam; Donald Phillips and Vincent Bonaddio of Foamex; Michael Crowell of Flexible Foam; Tony Vallecoccia of Valle; Stanley Pauley of Carpenter; Don Simpson, Buster Mann and Lee Lunsford of Hickory Springs; and, Bruce Schneider and Robert Heller of Future Foam.  These discussions led to a clear understanding and agreement that after the participants

19

would discuss the price increases and effective dates, they would then implement increases in accordance with that coordination.

80.     Virtually every known price increase, going back to at least 1999 and until Vitafoam's entry into the leniency program in the industry, has involved conspiratorial discussions among defendants on pricing. Chemical price increases from the major suppliers were the impetus for discussions.

81.     While at Vitafoam, the current President has received Vitafoams' competitors' draft price increase letters from other Vitafoam personnel, including David Gurley.  These include an email of David Gurley in which he acknowledges receiving draft price increase letters from competitor Don Simpson of Hickory Springs.

## EFFORTS TO ENFORCE THE CONSPIRACY

82.     Defendants also undertook efforts to police the conspiracy.  Participants, including the former Vice President of Vitafoam, followed up after discussions with competitors to see if the specific price increases and effective dates were actually being implemented.  For example, the Vitafoam VP called Valle and Carpenter to see if those competitors were putting the increases through as they had discussed and agreed.

## EXAMPLES OF SPECIFIC COMMUNICATIONS REGARDING PRICE FIXING AND CUSTOMER ALLOCATION

83.     On May 12, 2010, in Cleveland, Ohio, a telephone call occurred between Bruce Schneider of Future Foam and the President of Vitafoam.  Schneider works at Future Foam headquarters.  Sometime prior to this call, Schneider had placed a call to Vitafoam's President inquiring about Vitafoam's price increase plans.  During the call of May 12, 2010, Schneider discussed price increases involving foam producers. Schneider stated: "Now it's looking it's all everything is postponed to May 31st or June 1st There is a letter out from Carpenter for 31st of

May. This is a letter out from Flexible for June 1st. Foamex sent a letter two weeks ago at 15% but it looks like now that the increase is going to be 10 and 12% on foam." The Vitafoam President asked: "Are you hearing anything from the other guys? Or is it just kinda market stuff?" Schneider responded: "Oh, from the other, the other people the foamers? Yeah, we are hearing 10-12 ... It's kinda what we hear from other people what they expect. Ya know, it would have been great to get 20% but I don't think so." The conversation concluded with a request for information from Schneider. "If you hear anything from your friends in Europe. What's going on over there, I sure would like to know that as well."

84.     On June 10, 2010, Bruce Schneider of Future Foam left a voice mail message for the President of Vitafoam. In this message, Schneider stated, "Hi [President], this is Bruce Schneider... If you want to give me a call I've got information of why the increase changed from 10 to 12 to 9."

85.     In another instance, the current President of Vitafoam heard from a customer that Valle was not increasing prices.  The President then had the Vitafoam Vice President of Sales speak with Tony Vallecoccia of Valle to find out why Valle was not following the coordinated price increase.

86.     On May 20, 2010, John Howard, President of Domfoam, called the Vice President of Sales of Vitafoam twice to voice complaints about a Vitafoam salesman, Normand Widmer, attempting to acquire Domfoam customers. He stated:

> "Your fellow in Montreal here has been out, has his salesman Claude Robinson out knocking on doors they've never knocked on before, selling at or quoting at low low prices. If he wants a battle, I'll give him a battle ... These guys have been in at accounts they've never sold at ... if he wants a battle, he's got one. We will start going after his accounts and it won't be pretty. We'll both end up hurting ... I'm pissed off and our sales guys are pissed off and they're saying' John, are you going to do something about this, or are you just going to let this guy keep quoting low prices and

21

> taking business away from us. So. I'll let the dogs loose or I don't let the dogs loose. Want to mill it over and give me a shout back?"

The Vice President of Vitafoam responded:

> "It's sort of a bad time for me right now." Howard then stated "I don't expect an answer right now but, I'm leaving tomorrow night for a week. I would like to at least give the guys some indication that, 'Guys, give me another week. I think the dust is going to settle.' Or, 'Guys just do what you have to do. Go follow their delivery trucks and find out who the customers are and start knocking on doors and do whatever the hell you have to do. We have to respond.' So you're in a spot, I don't expect you to answer right now, but can you give me a shout back tomorrow?"

87.    On May 25, 2010, the Vice President of Vitafoam called Howard back. Howard stated:

> "Just, you know we've kind of stayed out of each other's way for some time here while business is quiet. There's just no business to be had and dropping prices is only going to benefit the customers. I can't afford to have him take stuff away ... It'll be a rough go if he wants to go and quote prices in places where he's not currently selling ... Tell Normand it's a, I mean we just don't even know who your accounts are. Basically we've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't currently sell, we're going to go after his accounts. So, business decision, you know, whatever way the chips fall, that's the way they're going to fall, and life will go on. But the buyers are asking me, you know, 'John, you're always telling us to stay away.' We do the same thing with Foamex, we don't go after their accounts. Haven't for a while business has been in the shitter. Just kind of stayed away and they've stayed away from our accounts too, so prices have been fairly stable. There ain't much business out there and dropping prices and only the customers are going to benefit. But let him make his decision and if it's to continue going after them then tell him there'll be some consequences. That's it. I'm not gonna, no threats but I can't not do anything. The sales guys are getting kind of. .. 'Hey, John, you're telling us don't go here, don't go there, don't sell that one, don't go quote prices there.' You know, eventually they're going to think I got no nuts, so sooner or later I've got to tell them 'Guys, just go and do what you got to do.' ... Keep an eye on this guy, it's ah, he needs coaching, there you go."

22

88.     On May 25, 2010, Howard left a voicemail message for the Vice President of

Vitafoam:

> "Hi, it's John ... we never really did resolve anything, I guess I did most of the talking ... where do we leave this thing, vis-it-vis going after each other's accounts. I'd be quite happy just to let it settle right here and not do anything more. But if [the President of Vitafoam] got some real pressure on this fellow Widmer and he's going to continue to go after accounts that he currently doesn't sell, then I got to, I can't continue to hold our sales guys off. So, give it some thought and maybe over the next day or two, just give me a shout and let me know. I understand you can't override [President of Vitafoarn], but I can't just hold our guys at bay and tell them, 'Well, don't do anything guys,' That's not a winning strategy for us either. So, give me a call in the next day or two would you? And let me know what course of action Widmer's going to take here."

89.     On June 4, 2010, Tim Prescott of Vitafoam left a voice mail message for

Vitafoam's Vice President:

> "Hey, it's Tim ... Can you give me a call when you get a chance. I don't know whether you've spoken to [President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're going with the increase and he just called me again asking can VPS please call John Howard over at Domfoam."

90.     On June 3, 2010, Dean Bryuiannis of Valle called Steve Prescott of Vitafoam:

> Bryuiannis:  "I sent you a text regarding price increase letters. I'm assuming you've got most of the ones that you wanted to see. "

> Prescott:
> "I didn't see, I had the old boy had faxed me one from a couple of days ago ... Yah, okay, no problem, Yah, I guess, like that's, you know, it's game on again, isn't it."

> Bryuiannis: "Ah, we'll see what happens. I've got Carpenter, Flexible, Mohawk, Leggett."

> Prescott: "But it's warranted, you know what I mean. Like, we know the prices of raw material have been going up, so ah. "

Bryuiannis: "Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do."

Prescott: "Yah, yah. Well, yah, like I say it's it's game on. So I would imagine that most manufacturers will move forward with it. We will have to see whether they, whether they do or not and see how that goes."

Bryuiannis: "Yah, yah. Alright. Well our letter is out so hopefully I'm assuming you've probably put something out by now."

Prescott: "It's as good as done."

Bryuiannis: "Okay. Well we're already out, so we've already put our letter out."

91.    On June 9, 2010, Bryuiannis called Prescott twice, leaving a voice mail message first, then called again to further discuss the price increase.

Bryuiannis: "Still haven't seen or heard of your increase letter yet."

Prescott: "Well, have a look around."

Bryuiannis: "I have. Haven't found anything yet ... I've still got one guy telling me that you haven't issued a letter. So have you issued? Yes or no?"

Prescott: "People will lie to you, Dean."

Bryuiannis: "Are you around the same time frame as us? July 5th or what?"

Prescott: "Ah, yah, close."

Bryuiannis: "Okay. And you haven't seen what, sorry? You haven't seen other increase letters or did you get all of those?"

Prescott: "Well, I know, I know that, know Stan, Stan said that he'd seen the Mohawk one and ... I guess one of the other U.S. guys. You know, everyone waits for the leader and once the leader goes out then everyone else follows cause we all know that the prices of material have gone up so, you know what I mean?"

Bryuiannis: "Well at the end of the day over the last two increases we have chatted about it so just wanna make sure you got your letter out."

Prescott: "Yah. Okay pal."

92.   Additional documents, including emails, provide further evidence of this conspiracy and communication among the competitors.

a.   On May 22, 2008, Nikki Walborn at Scottdel sent an email with an attachment of a draft Scottdel fuel surcharge and price increase letter to a number of Scottdel employees, including Louie Carson and Jeff Carter (Within a year of this email, Jeff Carter went from Scottdel to Future Foam in Texas.) On May 29, 2008, Jeff Carter forwarded this email and price increase letter to David Gurley at Vitafoam, which Gurley then forwarded to his superior at Vitafoam, the company President.

b.   On July 7, 2008, Jeff Carter while still at Scottdel forwarded via email a draft price increase letter to David Gurley of Vitafoam, stating, "David, Here is a copy of our next increase letter. Jeff." Gurley forwarded this email and draft increase letter to the company President. The President forwarded this string of emails and draft increase letter to his subordinates at Vitafoam, the V.P. Sales & Marketing, and Steve Prescott.

c.   On July 9, 2008, Steve Prescott forwarded the email string and letter to Stan Miller of Vitafoam, with the message, "Hey pal you thought the first one was tough! Check with your Carpenter contact to see when they plan on pulling the trigger."

d.   On July 11, 2008, Stan Miller reported back to Prescott via email, stating:

"Steve, I talked to Carpenter and he says that he has found his info. That Mohawk has gone up the 12 points on business other then the EOR orders from the show. He said they went up the full 12% in Vancouver and they have gotten some for the business back. He had not heard of Scottdale [sic] increase but had been told that there was a good chance they would be going up. I just talked to Randy from Shnier and he said from the pricing his sales people have found that Mohawk has not gone up. Carmine has been after him for copies of their pricing but he can't get his hands on it. He told me they lost an order to Mohawk in Calgary for Carpet Supermarket and that is where Ben Flagel is now." Prescott asked in an email to Miller "Will Ben share info?" Miller shortly thereafter on the same day responds to Prescott via email, stating, "Dan from Carpenter just called and said they will be going up 13% on Aug. 11/08."

e.   On May 21, 2009, Steve Prescott of Vitafoam sent draft price increase letters to other Vitafoam employees. One of the recipients, David Gurley of Vitafoam,

forwarded those price increase letters to Jeff Carter of Future Foam in Texas. Jeff Carter then forwarded this email to David Carson and Louie Carson of Scottdel stating:

> "Louie and David, You probably have seen all these. It's crazy out there again, personally I don't think this is enough of an increase."

f.  Louie Carson responded to Carter thanking Carter for the information. Carter forwarded his string of emails with Louie Carson back to David Gurley at Vitafoarn.  Gurley forwarded the string to his superiors at Vitafoam, V.P. of Sales and President with the message:

> "Please keep this confidential and read from the bottom up. It was sent to my friend Jeff Carter @Future Foam in Texas and talks about Vita and Ohio Valley. Louie Carson is one of the owners of Scotdel."

## INDUSTRY MEETINGS

93.  Representatives of defendants have regularly met through such organizations as the Polyurethane Foam Association ("PFA"), the International Sleep Products Association ("IPSA"), and Surfaces, a trade group which includes polyurethane carpet underlay producers.

94.  As previously stated, representatives from defendant companies reached agreements at these industry meetings held in the United States and abroad.

95.  Representatives of defendants used these trade association meetings as nothing more than "meet-and-greet" sessions with their competitors.

96.  Representatives of defendants disguised their attendance at these events as information gathering and merely used them as an opportunity to fix prices and divvy up their customers in person.

97.  Representatives of defendants not only had no intention of learning about the market at these meetings, they essentially controlled the market, and attended these meetings to further demonstrate their control.

98.     Upon information and belief, an understanding and agreement existed among the competitors in the foam industry to collectively support price increases. This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases with typically the same effective dates.

99.     Upon information and belief, Defendants also agreed to avoid each other's customers and not attempt to take business or market share from one another.

100.    Upon information and belief, the participants in this conspiracy took numerous steps to avoid detection of their conspiracy. At times, full names would not be used in correspondence and instead participants would only using first names or initials. Conspirators took advantage of attending the PFA meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings. Similarly, competitors visited each other's manufacturing facilities for the purported purpose of sharing technological and operational advances, but were actually using the opportunity to discuss coordinated price increases.

101.    Virtually every known price increase in the industry, going back to at least 1999 and until Vitafoam's entry into the leniency program, has involved conspiratorial discussions among Defendants on pricing. Chemical price increases from the major suppliers were the impetus for discussions.

## INELASTIC DEMAND

102.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small, decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality,

and so continue to purchase despite a price increase.

103.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

104.     Demand for polyurethane foam is relatively inelastic. According to the Polyurethane Foam Association, "In furniture and bedding applications, short staple polyester fiber is often used instead of [flexible polyurethane foam], as is cotton, but both alternative materials have poor height recovery characteristics after compression. Steel springs also recover well but must be insulated from the user with some type of cushioning material. Comparing [flexible polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute."

105.     Defendants alleged here to be participants in the conspiracy represent a significant portion of the United States polyurethane foam market. Because of the prohibitive freight costs associated with transporting the low-cost, bulky material, imports from outside North America represent a negligible portion of the market.

## OPPORTUNITIES TO CONSPIRE

106.     Defendants are members of trade associations, including the PFA, International Sleep Products Association, and others.

107.     Approximately 70% of U.S. Polyurethane Foam manufacturers are PFA members.

108.     As discussed below, during trade association meetings – including PFA meetings - Defendants seized opportunities to meet in person to allocate customers and coordinate price increases.

## TRADE ASSOCIATIONS AND BUSINESS ORGANIZATIONS

109.    Various industry trade organizations or events facilitated Defendants' illegal conduct. Representatives of Defendants have regularly met through such organizations as the PFA, the International Sleep Products Association ("IPSA"), and Surfaces, a trade group which includes polyurethane carpet underlay producers.

110.    As previously stated, representatives of Defendants reached agreements at these industry meetings held in the United States and abroad.

111.    Representatives of Defendants disguised their attendance at these events as information gathering and merely used them as an opportunity to fix prices and divvy up their customers in person.

112.    Representatives of Defendants not only had no intention of learning about the market at these meetings, they essentially controlled the market, and attended these meetings to further demonstrate their control.

## GOVERNMENT INVESTIGATION

113.    On or about July 27, 2010, it was publicly disclosed that the FBI, as part of a multi-jurisdictional investigation of polyurethane foam manufacturers, raided the offices of Carpenter and its competitors and seized documents and shuttered certain of Carpenter's offices.

114.    Carpenter confirmed the investigation, saying: "In connection with a multi-jurisdiction investigation of the pricing practices to [sic] polyurethane foam products, the U.S. government has required that manufacturers of polyurethane foam, including Carpenter Co., produce information and documents. Carpenter Co. is being fully responsive and cooperative with the government to facilitate their review."

115.     On or about that same day, the European Commission ("EC") raided the offices of several polyurethane foam manufacturers.  Carpenter was one of the targets of the EC raids as well.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

116.     Plaintiff  had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to the disclosure of Vitafoam's cooperation with the DOJ.

117.     Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiff and Class members. These violations constitute injurious acts which restart the applicable statute of limitations

118.     In addition, Defendants' and their co-conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was kept secret.  As a result, Plaintiff and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for polyurethane foam throughout the United States throughout the Class Period. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

119.     Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

120.     Neither Defendants nor their co-conspirators told Plaintiff or other Class members that they were fixing prices and allocating customers, or engaging in the other unlawful

collusive practices alleged herein. By its very nature, Defendants' and their co-conspirators'

conspiracy was inherently self-concealing.

121.    Defendants and their co-conspirators engaged in a successful price-fixing and

customer allocation conspiracy, which they affirmatively concealed:

a.    by meeting secretly (including use of private telephonic communications) to discuss prices, customers, and markets of polyurethane foam sold in the United States and elsewhere;

b.    by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

c.    by holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending; and

d.    by disguising price-fixing meetings and communications as technical and operational meetings.

## INJURY TO PLAINTIFF

122.    The unlawful contract, combination and/or conspiracy alleged above had and is

having, *inter alia,* the following effects:

a.    Prices charged by Defendants and their co-conspirators to suppliers to Plaintiff and the members of Class for polyurethane foam products were maintained at artificially high and supracompetitive levels;

b.    Plaintiff and members of the Class were required to pay more for products manufactured with polyurethane foam than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing; and

c.    Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for polyurethane foam.

123.    During and throughout the period of the contract, combination or conspiracy

alleged above, Plaintiff and members of the Class indirectly purchased polyurethane foam from

Defendants in the United States.

124.     Plaintiff and the other Class members paid more for the products utilizing polyurethane foam than they would have paid under conditions of free and open competition.

125.     As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

## CLASS ACTION ALLEGATIONS

126.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

127.     Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following classes (the "Classes") with respect to claims under the antitrust and/or consumer protection statutes of each of the below jurisdictions and under common law principles of unjust enrichment recognized in each of those jurisdictions:

> All persons or entities in Arizona, California, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts,  Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin which purchased polyurethane foam indirectly from Defendants or their unnamed coconspirators from January 1, 1999 to the present. Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

> All persons or entities in California which purchased polyurethane foam indirectly from Defendants or their unnamed co-conspirators from January 1, 1999 to the present. Excluded from the Class are governmental entities, Defendants, their co- conspirators and their representatives, parents, subsidiaries and affiliates (the "California Subclass").

128.     The precise number of Class members is unknown to Plaintiff. However, due to the nature of the trade and commerce involved, Plaintiff is informed and believes, and thereon alleges, that the Class numbers in the thousands.

129.     The Classes are so numerous and geographically dispersed that joinder of all members is impracticable.

130.     Class members are identifiable from information and records in the possession of Defendants.

131.     There are questions of law and fact common to the Classes. The antitrust, consumer protection and unjust enrichment statutes and laws of the Class jurisdictions are similar and require proof of the same elements. These common elements relate to the existence of the conspiracy alleged, the enrichment obtained by Defendants, and the type and common pattern of injury sustained as a result thereof. The questions include, but are not limited to:

    a.  Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for polyurethane foam sold in the United States;

    b.  The identity of participants in the conspiracy;

    c.  The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

    d.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Classes;

    e.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, unjustly enriched Defendants;

    f.  The appropriate nature of class-wide equitable relief;

    g.  The effect of Defendants' conspiracy on the prices of polyurethane foam in the United States during the Class Period; and

    h.  The appropriate measure of damages sustained by Plaintiff and other members of the Classes.

132.     Plaintiff is a member of the Classes. Plaintiff's claims are typical of the claims of other members of the Classes, and Plaintiff will fairly and adequately protect the interests of the

members of the Classes. Plaintiff bought polyurethane foam indirectly from one or more Defendants. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Classes. In addition, Plaintiff is represented by competent counsel experienced in the prosecution of class action antitrust litigation.

133.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

134.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

135.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

    a.  It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

    b.  It would be virtually impossible for all members of the Classes to intervene as parties-plaintiff in this action;

    c.  It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

    d.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants; and

    e.  It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

136.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

137.    The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia:*

    a.  Defendants and their co-conspirators have sold polyurethane foam directly and indirectly throughout the United States;

    b.  Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell polyurethane foam throughout the United States;

    c.  In furtherance of the conspiracy alleged herein, Defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

    d.  The conspiracy alleged herein has affected billions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiff and other entities who are themselves engaged in commerce.

## FIRST CLAIM FOR RELIEF
### (Violation of the Clayton Act)

138.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

139.    Beginning at a time presently unknown to Plaintiff, but at least as early as 1999 and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violations of Section 4 of the Clayton Act, 15 U.S.C. §15 and Section 1 of the Sherman Act, 15 U.S.C. §1.

140.    In furtherance of the unlawful conspiracy, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia:*

    a.  agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of polyurethane foam sold in the United States;

35

     b.   participating in meetings, conversations, and communications with co-conspirators regarding prices to be charged for polyurethane foam;

     c.   agreeing to allocate customers;

     d.   meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

     e.   refraining from competing by refusing to offer polyurethane foam at prices below the agreed-upon fixed price.

141.    The combination and conspiracy alleged herein has had the following effects, among others:

     a.   Price competition in the sale of polyurethane foam has been restrained, suppressed, and/8or eliminated;

     b.   Prices for polyurethane foam sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

     c.   Those who purchased polyurethane foam indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

142.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of polyurethane foam.

143.    As a direct and proximate result of Defendants' illegal agreement, contract, combination trust and/or conspiracy, Plaintiff and the members of the Classes have been injured and damaged in their respective businesses and property according to proof and will continue to be damaged as long as Defendants' actions continue, and are accordingly entitled to injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26.

## SECOND CLAIM FOR RELIEF
### (Violation of State Antitrust Statutes)

145.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

146.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 et seq.

147.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code §§16700 et seq. and Cal. Bus. & Prof. Code §§17200 et seq.

148.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§28-4503 et seq.

149.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1 et seq.

150.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Illinois Antitrust Code, 740 Ill. Comp. Stat. 10/7 (2).

151.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

152.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1 101 et seq.

153.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§445.773 et seq.

154.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.52 et seq.

155.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801 et seq.

156.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§598A et seq.

157.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 et seq.

158.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New York General Business Law §§ 340 et seq.

159.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§75-1 et seq.

160.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent, Code §§51-08.1-0 et seq.

161.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§37-1 et seq.

162.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§47-25-101 et seq.

163.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§2453 et seq.

164.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§47-18-1 et seq.

165.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 et seq.

## THIRD CLAIM FOR RELIEF
### (Violation of State Consumer Protection and Unfair Competition Laws)

166.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

167.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

168.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Bus. & Prof. Code §17200 et seq.

169.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §28-3901 et seq.

170.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. §501.201 et seq.

171.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. §480 et seq.

172.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code §48-601 et seq.

173.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Maine Rev. Stat. §207 et seq.

174.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Rev. Stat. §59-1601 et seq.

175.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Stat. New Hampshire Rev. Stat. §358-A:2 et seq.

176.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. §57-12-1 et seq.

177.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Gen Bus. Law §349 et seq.

178.     Defendants have engaged in unfair competition or unfair or deceptive acts of or practices in violation of North Carolina Gen. Stat. §75-1.1 et seq.

179.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Revised Code Section 1345.01, et seq.

180.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Oregon Rev. Stat. §646.605 et seq.

181.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws §6-13.1-1 et seq.

182.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Code Laws §3 9-5-10 et seq.

183.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code §13-11-1 et seq.

184.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont §2451 et seq.

185.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code §46A-6-101 et seq.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment and Disgorgement of Profits)

186.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

187.    Defendants have been unjustly enriched through overpayments by Plaintiff and the Class members and the resulting profits.

188.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiff and the members of the Class.

189.    Plaintiff and members of the Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

## PETITION FOR RELIEF

WHEREFORE, Plaintiff petitions that:

A.  The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representative and consumer protection, that Plaintiff's counsel be appointed as counsel for the Class.

B.  The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, and violate the aforementioned statutes and laws, including Section 16 of the Clayton Act, 15 U.S.C. §26, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Classes for treble the amount of damages sustained by Plaintiff and the Classes as allowed by law, together with the costs of the action, including reasonable attorneys' fees, pre and post-judgment interest.

C.  Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein.

D.  The Court award Plaintiff and members of the Classes such other, further and different relief as may be necessary and appropriate.

January 24, 2011                                    Respectfully submitted,

RICHARD M. KERGER (0015864)
KIMBERLY CONKLIN (0074726)


By    /s/ Richard M. Kerger

**KERGER & HARTMAN, LLC**
33 S. Michigan Street, Suite 100
Toledo, OH 43604
Telephone: (419) 255-5990
Fax: (419) 255-5997
Email: rkerger@kergerlaw.com
Kconklin@kergerlaw.com

Marvin A. Miller
Lori A. Fanning
Matthew E. Van Tine
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Tele: (312) 332-3400
Fax:  (312) 676-2676
Email: MMiller@MillerLawLLC.com
LFanning@MillerLawLLC.com
MVantine@MillerLawLLC.com

Shpetim Ademi
Guri Ademi
David Syrios
**ADEMI & O'REILLY, LLP**
3620 East Layton Avenue
Cudahy, Wisconsin 53110
414 482-8000
SAdemi@ademilaw.com
GAdemi@ademilaw.com
DSyrios@ademilaw.com

*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues raised in the above Complaint.

_____/s/ Richard M. Kerger_____